Case 8:25-mj-01612-AAQ   Document 3   Filed 07/10/25   Page 1 of 16

✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

7:25 am, Jul 10 2025
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ M.D. _____ Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>INFORMATION RELATED TO THE ACCOUNT ASSOCIATED WITH CELLULAR TELEPHONE NUMBER (240) 868-5637<br><br>THAT IS STORED AT PREMISES CONROLLED BY TELECOMMUNICATIONS COMPANY AT&T INC. | Case No. 8:25-mj-1612-AAQ |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION FOR A WARRANT TO
SEARCH AND SEIZE**

I, Christopher Edmund, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a warrant authorizing the search for information associated with a certain cellular telephone assigned call number (240) 868-5637 (the "**THE ACCOUNT**"), that is stored at premises controlled by AT&T, Inc., a wireless telephone service provider headquartered at 208 South Akart Street, Dallas, TX 75202. The company receives legal service at their Global Legal Demands Center (GLDC) at 11760 US Highway 1, Suite 600 North Palm Beach, FL 33408. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703 (c)(1)(A) to require AT&T, Inc. to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including location-based data, which is

1

further described in Attachment A. Government-authorized persons will review the information to locate items described in Attachment B.

2. I have been a duly sworn law enforcement officer with the United States Park Police since 2016. I am empowered by law to investigate and make arrests for violations of federal law, as well as violations of District of Columbia, Maryland, and Virginia law. I am currently assigned to the United States Park Police Major Crimes Unit as a Detective. I have received instruction from the Federal Law Enforcement Training Center in the identification of numerous criminal violations. I have also completed the six-week Department of Interior Investigator Training Program which includes instruction on investigation of cellular devices, digital data, and internet investigations. Additionally, I have completed a 2-week course of instruction in criminal investigations at the DC Metropolitan Police Academy Investigator School. As a law enforcement officer, I have been involved in the investigation of numerous types of criminal acts which include, thefts, crimes of violence, sex crimes, and major traffic crashes which often involve fatalities in National Park Service jurisdictions within the District of Columbia, as well as the environs of Maryland, and Virginia. In my time as a Criminal Investigator, I have received specific training relating to the digital data stored by most cellular service providers including T-Mobile, AT&T and Verizon Wireless. I have successfully applied for search warrants from cell phone service providers and am familiar with what data they store and how that information could be valuable evidence in a criminal investigation. I am also experienced in analyzing this type of data to determine its evidentiary value.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and witnesses.

As this affidavit is submitted for the limited purpose of supporting probable cause, I have not included every fact known to me or conveyed to me concerning this investigation.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believed that the **TARGET ACCOUNT** associated with cellular telephone number 240-868-5637, which does belong to **AARON LEVERT CROOM ("Croom")**, and as described in Attachment A, contains electronically stored records and data, as described in Attachment B, that is evidence of the commission of the offenses of 18 U.S.C. § 1112 (Manslaughter); 36 C.F.R §§ 4.23 (operating a motor vehicle while under the influence of alcohol to a degree that rendered the defendant incapable of safe operation and while the alcohol concentration in his blood was 0.08 grams or more of alcohol per 100 milliliter of blood); 36 C.F.R §§ 4.2, assimilating Md. Transp. Art. § 21-901.1(a) (driving a vehicle in a manner that indicates a wonton and willful disregard for the safety of persons and property); and 36 C.F.R. § 4.2, assimilating Md. Transp. Art. § 20-102 (leaving the scene of an accident resulting in death).

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3). Specifically, the Court is" a court of general criminal jurisdiction of a State authorized by the law of that State to issue search warrants." 18 U.S.C. §2711(3)(B).

## PROBABLE CAUSE

6. On Friday April 18th, 2025, at approximately 1:19 A.M., US Park Police Communications dispatched District Four officers to what was described as a single-vehicle crash with children ejected. The location of the crash was southbound on the Baltimore

Washington Parkway south of Route 197. Officers arrived on scene and advised that a white Honda Pilot (herein referred to as Vehicle 2) had left the roadway and crashed into the wood line. Vehicle 2 had been occupied by a family consisting of two adults and four juveniles. One juvenile (herein referred to as JV-1) had been ejected from the vehicle and was pronounced deceased on the scene by an Anne Arundel County Fire and EMS at 1:45 A.M. A second juvenile (JV-2) from Vehicle 2 was transported to Children's National Hospital where they eventually succumbed to their injuries. JV-2 was pronounced deceased later that day at 4:26 P.M. The remainder of the family, two adults, and two juveniles were transported to Medstar Washington Hospital Center and Children's National Hospital, with non-life-threatening injuries.

7. A black BMW X5 (Vehicle 1) was located approximately one-half mile south of Vehicle 2, still on the southbound lanes of the Baltimore Washington Parkway. Vehicle 1 had suffered heavy front-end damage, the airbags had been deployed, and it was disabled in the roadway. Officers made contact with the driver, who was standing near Vehicle 1, later identified as **Croom**.[1] **Croom** told officers that he had been driving Vehicle 1. Officers noticed an odor of an alcoholic beverage emanating from **Croom** and that **Croom's** eyes were bloodshot.

8. Two witnesses, W-1 and W-2, the driver and passenger of another vehicle that stopped at the crash scene, both reported that they saw a large black SUV-style vehicle crash into the back of Vehicle 2, sending Vehicle 2 off the road and into the wood line. W-1 and W-2 further stated that the black SUV continued driving southbound, rather than stopping at the scene of the crash. The physical description of the striking vehicle provided by W-1 and W-2 matched

---

[1] **Croom** was identified on scene by US Park Police Officers by his West Virginia driver's license.

4

Vehicle 1. Moreover, later examination of Vehicle 1 revealed white paint chips matching Vehicle 2 transferred onto Vehicle 1's front end, as well as a piece of a muffler embedded in Vehicle 1's front grill. Vehicle 2 was missing part of its muffler.



9. W-1 and W-2 explained that Vehicle 1 had been swerving in and out of lanes of travel before the accident, almost hitting other vehicles on the roadway. They had consciously and intentionally tried to maintain a safe distance from Vehicle 1 while traveling southbound, as they believed the operator to be showing signs of impairment. W-1 drove around Vehicle 1 to get ahead and away from the suspected impaired driver. W-1 explained that Vehicle 1 sped past them at a high rate of speed and then crashed in the back of Vehicle 2. W-1 saw the crash send Vehicle 2 off the roadway and stopped to check on the welfare of the vehicle's occupants. W-1 observed that Vehicle 1 did not stop, but instead left the scene of the crash and continued driving

southbound. W-1 captured footage on their dash camera that showed Vehicle 2 leaving the roadway and Vehicle 1 leaving the scene.

10. **Croom** initially told officers that he had not consumed any alcohol that night and that he left the scene of the crash in an attempt to catch up with a dark-colored Hyundai Sonata that he stated he believed was involved. **Croom** said he was unable to continue because his vehicle had become disabled. **Croom** performed standardized field sobriety testing with the following results:

   1. HGN[2] – 4/6

   2. Walk and Turn[3] – 3/8

   3. One Leg Stand[4] – 0/4

11. A telephonic warrant for **Croom's** blood to be drawn for analysis was issued by a United States Magistrate Judge in the District of Maryland, and **Croom** was transported to Luminis Health Doctors Community Medical Center, where two vials of blood were drawn at 5:13 A.M. and 5:14 A.M., which was approximately four (4) hours after the crash. The District of Columbia Office of the Chief Medical Examiner analyzed the blood and reported on May 9, 2025, that the sample showed a blood alcohol concentration of .10 grams of ethanol per 100 milliliters of blood which is higher than the Per Se legal limit of .08 grams per 100 milliliters of blood.

---

[2] *See United States v. Horn*, 185 F. Supp. 2d 530, 537 (D. Md. 2002) for a description of the Horizontal Gaze Nystagmus Test ("HGN Test").
[3] *See Horn*, 185 F. Supp. 2d at 537–38 for a description of the Walk and Turn ("WAT") Test.
[4] *See Horn*, 185 F. Supp. 2d at 538 for a description of the One Leg Stand ("OLS") Test.

12. After the blood draw at the hospital, I provided **Croom** a courtesy ride to his mother's home in Washington, D.C. During the courtesy ride, I advised **Croom** of his Miranda rights, and he agreed to waive his rights and answer questions without having an attorney present. During the interview, which was recorded on my body worn camera, **Croom** admitted that he had consumed some wine for a period of about two hours before driving and also confirmed that his vehicle, Vehicle 1, had struck Vehicle 2 from behind. **Croom** stated that he had tried to engage his brakes when he saw that Vehicle 2 was braking but could not stop in time to avoid the collision. **Croom** further stated that he was on a phone call with his mother at the time of the crash, and that he had left Baltimore City to drive back to his residence in West Virginia because the motel he was staying in had roaches. Toward the end of the interview, **Croom's** phone, a [Black Apple iPhone 15 Pro Max with serial number D6WDHF21CJ and IMEI number 35 727579855878 6] was lawfully seized ("**Croom's Phone**.") At the conclusion of the interview, **Croom** was dropped off at his mother's home.

13. A criminal complaint was submitted on May 20th, 2025, and a United States Magistrate Judge in the District of Maryland issued an arrest warrant for **Croom**. **Croom** was arrested on May 22nd, 2025, on the charges and was brought to U.S. District Court in the District of West Virginia, in Martinsburg for an initial appearance.

## TARGET ACCOUNT

14. A search warrant for the electronically stored data on **Croom's Phone** was issued by a United States Magistrate Judge in the District of Maryland on May 8th, 2025. Ongoing analysis of the extracted data has revealed, in part, that **Croom** was using his cellular phone for communications, GPS directions, phone calls, internet browsing and pictures, among other

7

functions, during the day of April 17th, 2025, preceding the crash, and April 18th, 2025, up until the crash, as well as immediately afterwards. Some of the relevant data identified include user attribution evidence such as the name of the iPhone "A RON iPhone," as well as four (4) "selfie style" photos, stored in the device's Apple photos library, of **Croom's** torso, neck and arms. The photos also depict a large tattoo on **Croom's** chest. Relevant communication over the text messaging application to a woman with whom **Croom** was planning to provide with wine were noted. This individual was later identified and interviewed. She confirmed that she was with Croom on April 17th, 2025, before the fatal crash in the early morning hours of April 18th, 2025, and stated that **Croom** had consumed alcohol while they were together. Additionally, other photos stored on **Croom's Phone** showed this woman at the Washington Monument Grounds in Washington DC on April 17th, 2025, at approximately 11:30 P.M., which is two (2) hours before the fatal crash occurred. **Croom's** Apple Maps, Apple Wallet, and call logs were also analyzed. Through this analysis, pertinent information about **Croom's** purchases, location data, and people with whom he was in communication with were discovered. This analysis also confirmed that **Croom's Phone** is associated with the **TARGET ACCOUNT,** specifically that it receives service from AT&T, Inc. and the associated telephone number is (240) 868-5637. In the "Settings" section of **Croom's Phone**, and under the "about" tab, is a section titled "Carrier." The "Carrier" is listed as "AT&T 62.0." In the "Apps" section under "Settings" the tab entitled "Phone" shows the assigned phone number for **Croom's Phone** to be (240)868-5637.

15.  A preservation request for the records associated with the **TARGET ACCOUNT** was sent to the AT&T GLDC email account on May 16th, 2025. I received a confirmation email on the same date that the request was received and was being processed. AT&T GLDC informed me on May 26th, 2025, that the requested records had been preserved.

8

16. The requested information to be disclosed by AT&T, in particular, cell site information and per-call measurement data ("PCMD"), also referred to as timing advance, for the time period identified in Attachment B is likely to constitute evidence of the crimes under investigation.

**RECORDS**

17. Based on my training, experience, and research, I know that AT&T, Inc. is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the tower) to which the telephone connected. These towers are often a half mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

18. Based on my training and experience, I know that AT&T, Inc. can collect cell-site data about the **TARGET ACCOUNT**. I also know that wireless providers such as AT&T, Inc. typically collect and retain cell-site data pertaining to cellular phones to which they provide

9

service in their normal course of business in order to use this information for various business-related purposes.

19. Based on my training and experience, I know that AT&T also collects per-call measurement data ("PCMD"), also referred to as timing advance or AT&T's Location Database of Record (LOCDBOR). Timing advance information estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

20. Based on my training and experience, I know that wireless providers such as AT&T, Inc. typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I am also aware that wireless providers such as AT&T, Inc. typically collect and retain information about their subscribers'' use of wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **TARGET ACCOUNT** user or users and may assist in the identification of co-conspirators.

21. In this case, the cell-site evidence associated with the **TARGET ACCOUNT** will assist in identifying the location of **Croom's** cellular device, of which investigators know he was in possession of at the time, during the commission of the crimes described above. It will also

10

help to confirm or disprove the accounts given by witnesses and **Croom** himself about **Croom's** whereabouts before the deadly crash occurred. This information is likely to provide further insight into **Croom's** path of travel before the crash. This data may provide new leads of investigation and evidence of where **Croom** may have consumed or purchased alcohol. The call detail records, and a list of the cell site locations can be used to illustrate an approximate location of the target cell phone when it initiated contact with the network. These locations can then be mapped, and the cell site data plotted to illustrate the cell site activity over a particular period of time. It is known to investigators that **Croom** was in possession of his cellular device and was actively using it to send messages, make phone calls, map his trips, and browse the internet before, during, and after the commission of the crime. Based on the above information, the requested data to be searched will range from **April 17th, 2025**, at **12:01 AM (EST)** until after the crime was committed and **Croom's** phone was seized by law enforcement on **April 18th, 2025**, at **12:00 PM (EST)**.

## CONCLUSION

22.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of records associated with the **TARGET ACCOUNT** described in Attachment A to seek the items described in Attachment B. The government will execute this warrant by serving AT&T, Inc. GLDC, who will then provide the records, of which it has already compiled and preserved, to the United States Park Police. Because the warrant will be served on AT&T, Inc. GLDC who will then compile the requested records at a time convenient to it, good cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Christopher Edmund
Detective
United States Park Police

Subscribed and sworn to before me
on June 20, 2025:

Honorable Ajmel A. Quereshi, United States Magistrate Judge

## ATTACHMENT A

This warrant applies to records and information associated with the cellular telephone assigned call number (240) 868-5637 (**TARGET ACCOUNT**), that are stored at premises controlled by telecommunications company AT&T, Inc. (**THE PROVIDER**), a wireless telephone service provider headquartered at 208 South Akart Street, Dallas, TX 75202. The company receives legal service at their Global Legal Demands Center located at 11760 US Highway 1, Suite 600 North Palm Beach, FL 33408.

## ATTACHMENT B

I. **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of **THE PROVIDER**, including any information that has been deleted but is still available to **THE PROVIDER** or that has been preserved pursuant to a request made under 18 U.S.C. §2703(f), **THE PROVIDER** is required to disclose to the government the following information pertaining to the **TARGET ACCOUNT** listed in Attachment A for the time period of **April 17, 2025** at **12:01 a.m. (EST) to April 18, 2025**, at **12:00 p.m. (EST)**:

a. The following information about the customers or subscribers of the **TARGET ACCOUNT**:

  i. Names (including subscriber names, usernames, and screen names);

  ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

  iii. Local and long-distance telephone connection records;

  iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

  v. Length of services (including start date) and types of service utilized;

  vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"); Subscriber Identity Modules ("SIM"), Mobile Subscriber

                Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii.    Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

    viii.    Means and source of payment for such service (including any credit card or bank account number) and billing records.

b.    All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **TARGET ACCOUNT**, the cell site locations and sectors for ALL outgoing and incoming VOICE, SMS, and data transactions, including:

    i.    The date and time of communication, the method of communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses and IP addresses); and

    ii.    Information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received; and

    iii.    All available Mobile Data Sessions and IPv6 reports and any other location information, including "distance to tower: information or Timing Advance Information or AT&T's Location Database of record report.

AT&T, Inc. is hereby ordered to disclose the above information to the government within 10 days of issuance of this warrant.

II.    **Information to be Seized by the Government**

15

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 1112 (involuntary manslaughter) and/or 36 C.F.R. § 4.23 (driving under the influence of alcohol); 36 C.F.R. § 4.2, assimilating Md. Transp. Art. § 21-901.1(a) (reckless driving); and 36 C.F.R. § 4.2, assimilating Md. Transp. Art. § 20-102 (leaving the scene of an accident resulting in death) on or about **April 18, 2025** and involve **Aaron Croom (Croom)** and the **TARGET ACCOUNT** since **April 17, 2025**.